**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 07-cv-00722-WDM-MJW

SONYA DIAS,
HILLARY ENGEL, and
SHEYRL WHITE
individually and on behalf of all persons similarly situated,

      Plaintiffs,

v.

THE CITY AND COUNTY OF DENVER, COLORADO,
JOHN W. HICKENLOOPER, in his official and individual capacity;
NANCY SEVERSON, in her official and individual capacity;
DOUG KELLY, in his official and individual capacity; and
JUAN ZALASAR, in his official and individual capacity,

      Defendants.

---

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

---

      This case comes before me on Defendants City and County of Denver, John W. Hickenlooper, Nancy Severson, Doug Kelly, and Juan Zalasar's Motion for Summary Judgment (ECF No. 94).  Having reviewed the pleadings and the exhibits, I conclude that oral argument would not aid in my decision-making process.  For the reasons set forth below, Defendants' Motion for Summary Judgment shall be denied.

BACKGROUND

      This case arose out of a challenge to the City and County of Denver ordinance that bans the American Staffordshire Terrier, Staffordshire Bull Terrier, and American Pit Bull Terrier and any dog exhibiting a majority of the breeds' distinguishing characteristics ("Pit Bulls") within the Denver city limits.  Denver Municipal Code Section

8-55 *Pit Bulls Prohibited* ("Ordinance").  Plaintiffs claim that the Ordinance violates the Fourteenth Amendment because it deprives Plaintiffs of substantive due process.  *See Dias v. City & County of Denver*, 567 F.3d 1169, 1184 (10th Cir. 2009).

Denver enacted the Ordinance in 1989.  It was challenged in Denver District Court in 1989 as violative of the plaintiffs' Fourteenth Amendment rights to equal protection and procedural and substantive due process.  *See Colo. Dog Fanciers v. City and County of Denver*, Denver District Court Case Nos. 89-CV-11714 and 89-CV-12348.  Ultimately, the Colorado Supreme Court upheld the Ordinance.  *See id.*  The Ordinance remained in effect until April 21, 2004, when Gov. Bill Owens signed HB 04-1279, prohibiting Colorado municipalities and counties from enacting breed-specific legislation.  Denver suspended enforcement of the ban and filed suit in Denver District Court (*City and County of Denver v. State of Colo.*, Case No. 04-CV-3756) seeking declaratory judgment that the new state law violated home rule provisions in the Colorado Constitution.  Denver prevailed on its claim.  *See id.*  Denver resumed enforcing the ban on May 9, 2005.  The Ordinance is still in effect.

The Ordinance states in pertinent part:

(a)     It shall be unlawful for any person to own, possess, keep, exercise control over, maintain, harbor, transport, or sell within the city any pit bull.

(b)     Definitions.

(1)     An "owner," for purposes of this chapter, is defined as any person who owns, possesses, keeps, exercises control over, maintains, harbors, transports or sells an animal.

(2)     A "pit bull," for purposes of this chapter, is defined as any dog that is an American Pit Bull Terrier, American Staffordshire Terrier, Staffordshire Bull Terrier, or any dog

displaying the majority of physical traits of any one (1) or more of the above breeds, or any dog exhibiting those distinguishing characteristics which substantially conform to the standards established by the American Kennel Club or United Kennel Club for any of the above breeds.  The A.K.C. and U.K.C. standards for the above breeds are on file in the office of the clerk and recorder, ex officio clerk of the City and County of Denver, at City Clerk Filing No. 89457. . . .

. . . .

(f)     When the manager has impounded any pit bull dog pursuant to this section, and the owner of such dog disputes the classification of such dog as a pit bull, the owner of such dog may file a written petition with the manager for a hearing concerning such classification no later than seven (7) days after impoundment. Such petition shall include the name and address, including mailing address, of the petitioner.  The manager will then issue a notice of hearing date by mailing a copy to the petitioner's address no later than ten (10) days prior to the date of the hearing.  Where no written request from the owner for a hearing is received by the manager within seven (7) days of impoundment, the pit bull shall be destroyed.

The hearing, if any, will be held before the manager or a hearing officer designated by the manager.  Any facts which the petitioners wishes to be considered shall be submitted under oath or affirmation either in writing or orally at the hearing. The manager or hearing officer shall make a final determination whether the dog is a pit bull as defined in subsection (b)(2) of this section. Such final determination shall be considered a final order of the manager subject to review under Rule 106(a)(4) of the state rules of civil procedure.

If the dog is found to be a pit bull, it shall be destroyed, unless the owner produces evidence deemed sufficient by the manager that the pit bull is to be permanently taken out of Denver and the owner pays the cost of impoundment.  If the dog is found not to be a pit bull, the dog shall be released to the owner.  The procedures in this subsection (f) shall not apply and the owner is not entitled to such a hearing with respect to any dog which was impounded as the

immediate result of an attack or bite as defined in section 8-51. In those instances, the dog shall be handled and the procedures governed by the provisions of article VIII of this chapter.

Denver, Colo., Rev. Mun. Code § 8-55[1]

Plaintiffs Sonya Dias, Hillary Engel, and Sheryl White each owns a dog that is either a Pit Bull or shares a "majority of physical traits" associated with Pit Bulls.  The Ordinance prompted Ms. Dias and Ms. Engel to move out of Denver so that they could keep their dogs.  Neither one was ticketed or had her dog seized pursuant to the Ordinance.

Ms. White's dog was seized by Denver's Animal Control.  Animal Control also issued a summons to her husband, who was walking the dog at the time, for having violated the Ordinance.  Mr. and Ms. White went to Denver Municipal Animal Shelter to get the dog.  Before the officer would release the dog to them, he required that Mr. White sign a declaration that he agreed to remove the Pit Bull dog from the City and County of Denver, immediately.  Suppl. Compl. ¶ 34, ECF No. 54.  He also had to sign a statement that the dog was an "American Pit Bull Terrier, American Staffordshire Terrier, Staffordshire Bull Terrier, or exhibits the majority of physical traits of any (1) or more of the above breeds." *Id.* at ¶ 35.  After the signature block, the form stated, "Note: signing this document waives your right under D.R.M.C. §(f) to contest the determination that this animal is a Pit Bull." *Id.*

When Ms. White was able to retrieve her dog from the custody of Animal Control,

---

[1] City and County of Denver, Colo., Revised Municipal Code 8-55, can be found at: http://library.municode.com/index.aspx?clientId=10257&stateId=6&stateName= Colorado.

she removed the dog from Denver to Raton, New Mexico.  *Id.* at ¶ 38.  She and her husband requested an administrative hearing to challenge Denver's determination that the dog was a prohibited animal.  *Id.* at ¶ 36.  When Mr. and Ms. White appeared in county court on the Ordinance violation, Ms. White requested that she be substituted on the summons for her husband because he did not wish to answer the charges related to the dog.  The magistrate granted her motion.  *Id.* at ¶ 39.  At the March 3, 2006 administrative hearing, the officer determined that Ms. White's dog was a prohibited animal.  *Id.* at ¶¶ 40–41.  At Ms. White's trial for the Ordinance violation, the city dismissed the charges against her.  After that, she brought her dog back to the Denver metro area.  *Id.* at ¶ 42.  Eventually, she moved to Texas and took the dog with her.  *Id.* at ¶ 43.

Defendants are the City and County of Denver and the Mayor, managers and directors of departments within the executive branch of the government of the City and County of Denver.  *See Denver City Charter*, Title II, art. 2, Mayor and Executive Departments; Title II, art. 2, Part 12 Environmental Health; and Title II, art. 2, Div. 3 Protection Against Animals.  Plaintiffs sue the Mayor, managers and directors in their individual capacities as well as their official capacities.

Plaintiffs filed this case on April 6, 2007, as a civil rights action for declaratory and injunctive relief, damages, and attorneys' fees under 42 U.S.C. §§ 1983, 1988, and 28 U.S.C. § 2201.  They sought to bring the action on behalf of themselves and all persons similarly situated, pursuant to Fed. R. Civ. P. 23(b)(2) and/or Rule 23(b)(3), and Rule 23(c).  Supp. Compl.¶ 19, ECF No. 54.

Plaintiffs initially alleged four claims:  (1) various violations of their procedural due

process rights under the Fifth and Fourteenth Amendments; (2) violations of their procedural due process rights because the ordinance is allegedly unconstitutionally vague; (3) violations of their equal protection rights under the Fourteenth Amendment; and (4) violations of their substantive due process rights under the Fourteenth Amendment because the ordinance allows a dog to be taken from its owner without any evidence that the dog presents a public safety threat.  *See* Suppl. Compl. ¶ 60, ECF No. 54.

On March 20, 2008, I granted the Motion to dismiss (ECF No. 65) concluding that:  (1) Plaintiffs' due process rights were protected by a post-deprivation hearing, *id.* at 10; (2) that the Ordinance is sufficiently definite that ordinary people can understand the conduct that it prohibits, *id.* at 16; (3) that Plaintiffs' equal protection claim does not implicate state action because it is the dog owner, not the State, who chooses whether to have an administrative hearing to determine whether the dog is a Pit Bull or admit that the dog is a banned Pit Bull, and substantive due process claim, *id.* at 19; (4) that although dogs are accorded property status, the owner's rights are qualified and subject to the police power of the state to protect the public's safety and welfare and therefore, in providing the right to a post-seizure hearing, the citizen is not subjected to an arbitrary deprivation of property rights, (*id.* at 21–22); (5) and that there is no fundamental liberty interest in the "human/companion animal bond," (*Id.* at 21–22) as there is in the freedom of speech or the right to vote.  *Id.*  I also denied Plaintiffs' Motion for Class Certification (ECF No. 36) as moot.

Plaintiffs then appealed only the dismissal of their claims that the Ordinance is unconstitutionally vague and violative of Plaintiffs' substantive due process rights.  *See*

6

*Dias v. City & Cnty. of Denver*, 567 F.3d 1169 (10th Cir. 2009).

The Tenth Circuit affirmed in part and reversed in part. *Id.* The Court decided *sua sponte* that Plaintiffs lack standing to seek prospective relief because they have not alleged a credible threat of future prosecution but it concluded that Plaintiffs have standing for retrospective relief and that the substantive due process claim could proceed to the extent it seeks retrospective relief. *Id.* at 1178. The Court affirmed the dismissal of the vagueness challenge. *Id.* at 1180.

The Tenth Circuit agreed that no fundamental liberty interest is at stake in this case; and therefore, the rational basis test applies. *Id.* at 1181. The court accepted as uncontested that Defendants have a legitimate interest in animal control and the health and safety of the public. *Id.* at 1183. The court viewed the factual allegations in the light most favorable to the plaintiffs and concluded that "the complaint plausibly alleges that the Ordinance is not rationally related to a legitimate government interest." *Id.* at 1183. Accordingly, the Tenth Circuit reversed the dismissal of the substantive due process claim and remanded the case with instructions to examine the claim on the merits under a rational basis review. *Id.* at 1184.

Upon remand, Defendants filed their Motion claiming that there are no material facts at issue regarding whether the Ordinance is rationally related to a legitimate government purpose; that Ms. Dias lacks standing to bring her claims; and that the individual defendants have no liability under 28 U.S.C. § 1983.

The parties have submitted expert opinion evidence as part of their briefing. The experts disagree on whether a determination of a dog's threat to harm can be made on a breed-specific basis. They even disagree regarding the significance of the results of

research on the subject.

Defendants' expert, Alan M. Beck, Sc.D., states that Pit Bulls are widely recognizable as they are routinely advertised for sale in numerous outlets.  He states that the American Kennel Club does not recognize a Pit Bull breed per se.  He asserts, however, that the description of the Staffordshire Bull Terrier and the Bull Terrier suffice to describe Pit Bulls for the Ordinance.  He states that Pit Bulls make up no more than 2% to 9% of the canine population; yet the breed is responsible for 30% of fatal attacks on humans.  Expert Report at 2–3 ECF No. 94-2; Expert Report at 2, ECF No. 94-3.

He opines that the "[b]reed is a documented factor in the epidemiology of fatal dog bite."  9/27/2007 Expert Report at 1, ECF No. 94-2.  He states:  "While all breeds of dogs can and do bite on occasion, pit bulls (due to their inherent fighting nature, strength and high pain threshold) have a much higher potential of being involved in a serious attack than most, if not all, breeds."  11/1/2007 Expert Report at 3-4, ECF No. 94-3.  He testified that the genetic components of a Pit Bull make it a bad pet because of its unpredictability in the presence of other people, it has a serious bite when it does bite and it has a low threshold for attacking other dogs.  *See* Exhibit A-7 to Mot. Summ. J. at ¶ 86:1-15, ECF No. 94-7.

Dr. Beck cites two studies to support his opinion that Pit Bulls are more likely to bite than other breeds.  In the first study (published in 1989), 101 dogs whose breeds could be determined were studied.  He states that the study showed that Pit Bulls comprised 43% of the attacking dogs with the second most frequent biters being Siberian huskies, malamutes, and their mixes at 18%.  ECF No. 94-3 at 2.  He also reports that the study found that Pit Bulls are more prone to kill than other breeds.  *Id.*

8

(listing Pit Bulls as 18.8% fatal single dog attacks followed by Rottweilers at 10.9%, and German Shepherds at 8.2%.); *see also*, Alan M. Beck Dep., 73:16-75:2, ECF No. 94-7 (stating that Pit Bulls are more likely to be involved in attacks than any other dog).

In contrast, Plaintiffs' experts agree with one another that a propensity to bite and cause harm cannot be predicted only from breed-specific characteristics, such as appearance.  Dr. Karen Overall states that whether a dog bites is not a question of his breed (Expert Rep. of Dr. Karen Overall, MA, VMD, PhD at 7, ECF No. 100-4) nor is breed determinative of propensity to attack and that appearance is not necessarily reliable in determining a breed.  *See* Dep. of Karen Overall, MA, VMD, PhD at 2, 6–7 ECF 100-10.  "People need to stop thinking about breeds because they think they are all the same, and start thinking about individual dogs and the factors that can cause serious damage in a bite."  *Id.* at 6.

Dr. Randall Lockwood, another expert for Plaintiffs, agrees with Overall, stating that the breed of a dog is not a predictor that a dog will attack or bite.  *See* Rebuttal Rep. at 2, ECF 100-2; *see also*, Expert Rep. of David L. Banks, PhD at 5 (quoting Sacks, Lockwood, Hornreicht, and Sattin, *Fatal Dog Attacks, 1989-1994*, *Pediatrics* 1996 Jun (Pt. 1:891:5), ECF No. 100-6.  ("Breed specific approaches to the control of dog bites do not address the issue.")).  He says that dog bites are a result of the interaction of many factors including the dog's sex, spay/neuter status, health, breed, and specific lineage within a breed, the owner's socialization of the dog, the training and treatment the dog receives, the supervision and restraint of the animal, and the actions of the victim.  Rebuttal Rep. at 2, ECF 100-2; *see also*, Expert Rep. of Dr. Karen Overall, MA, VMD, PhD at 2–6, ECF No. 100-4

9

Dr. Lockwood notes that the more popular a dog, the more frequent the incident

of bites by that breed of dog.  Rebuttal Rep. at 3, ECF 100-2; *see also*, Expert Rep. of

Randall Lockwood at 6, ECF No. 100-4 (stating that relative risk that a dog of a specific

breed will bite must be measured against a good estimate of the population of all

breeds); Expert Rep. of David L. Banks, PhD at 9 (citing Sacks, Lockwood, et al, *Breeds*

*of Dogs Involved in Fatal Human Attacks in the United States*, 2000) (noting that the

update of the 1996 paper reports that Rottweiler-related deaths increased as the breed

became more popular), ECF No. 100-6.

Dr. Lockwood also takes issue with Dr. Beck's reference to a 2000 Center for

Disease Control ("CDC") study, to which Dr. Lockwood was a contributor, as suggesting

that there may be a breed-specific problem with dog-bite related fatalities for Rottweilers

and Pit Bulls.  *Id.*; *see also*, Beck Report at 3, ECF 94-3.  Lockwood states that Dr. Beck

misused the CDC study to extrapolate breed-specific characteristics.  Dr. Lockwood

reports that the frequent misuse of the study caused the American Veterinary Medical

Association to issue a formal letter warning:

> the data contained within [the CDC] report **CANNOT be used to infer any**
> **breed-specific risk** for dog bite fatalities (*e.g.*, neither pit bull-type dogs nor
> Rottweilers can be said to be more "dangerous" than any other breed based
> on the contents of this report.)  To obtain such risk information it would be
> necessary to know the numbers of each breed currently residing in the
> United States.  Such information is not available.

ECF No. 100-2 at 3 (emphasis in expert opinion).

## STANDARD OF REVIEW

Summary judgment may be granted where "the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and the . . . moving party is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(c).  The burden of showing that no

genuine issue of material fact exists is borne by the moving party.  *E.E.O.C. v. Horizon/*

*MS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000).  Summary judgment will

not lie if the dispute about a material fact is "genuine," that is, if the evidence is such

that a reasonable jury could return a verdict for the non-moving party.  *Anderson v.*

*Liberty Lobby*, 477 U.S. 242, 248 (1986).

When ruling on a motion for summary judgment, "credibility determinations,

weighing of evidence, and drawing of legitimate inferences from the facts are jury

functions, not those of a judge[.]"  *Id.* at 255.  The evidence of the non-movant is to be

believed and all justifiable inferences are to be drawn in his favor.  *Id.*  Courts should be

cautious in granting summary judgment where there is reason to believe that the better

course would be to proceed to trial.  *Id.* (internal citation omitted).  At summary

judgment stage, the judge's function is not himself to weigh the evidence and determine

the truth of the matter but to determine whether there is a genuine issue for trial.  *Id.* at

249.

DISCUSSION

A.    <u>Substantive Due Process</u>

The remaining issue of this case is whether the Ordinance violates Plaintiffs'

substantive due process rights because the Ordinance is allegedly not rationally related

to a legitimate government purpose.  To prove such a case, the Plaintiffs have the very

difficult burden to "negative every conceivable basis which might support" the

Ordinance.  *Beach Commc'ns., Inc.* 508 U.S. 307, 315 (quoting *Lehnhausen v. Lake*

*Shore Auto Parts Co.,* 410 U.S. 356 (1973)).  The Colorado Supreme Court has recast

11

this burden to require the plaintiff challenging an ordinance to prove unconstitutionality beyond a reasonable doubt. *Colo. Dog Fanciers, Inc. v. Denver*, 820 P.2d at 647 (citing *People v. Unruh*, 713 P.2d at 373). This standard is quite deferential of legislative actions. *Powers v. Harris*, 379 F.3d 1208, 1215 (10th Cir. 2004). A court is not to exercise its own judgment or sit as a super legislator. *See New Orleans v. Dukes*, 427 U.S. 297, 303 (1976).

Determining whether an ordinance survives the rational basis test is a two-step process. *See Powers*, 379 F.3d 1208; *see also*, *219 S. Atl. Blvd. Inc. v. City of Ft. Lauderdale, Fla.*, 239 F. Supp. 2d 1265, 1276 (S.D. Fla. 2002). The first step—to identify the legitimate government purpose pursued by the city—has been resolved by the Tenth Circuit, stating, "[i]t is uncontested that Denver has a legitimate interest in animal control—the protection of health and safety of the public." *Dias v. City & County of Denver*, 567 F.3d 1169, 1183 (10th Cir. 2009). It is the second step that presents the issue here—is there a rational basis for enacting the Ordinance to serve the stated purpose of dangerous animal control? *See id.*

The premise of Defendants' Motion for Summary Judgment is that there is no genuine issue of material fact that Plaintiffs can meet their burden; *i.e.*, that they are unable to prove beyond a reasonable doubt that no rational basis for the Ordinance exists. Plaintiffs respond that indeed there is no rational basis; in particular, that given the dispute between the experts, genuine issues of fact exist which preclude summary judgment. In essence, Plaintiffs' experts opine that, given the current state of the science, a breed specific prohibition such as Denver's is not rationally based to serve the legitimate government purpose. Defendants' expert disagrees and to bolster their

case, Defendants request that I take judicial notice of my colleague's, Chief Judge Wiley

Y. Daniel, findings of fact made in *Am. Canine Found. v. City of Aurora, Colo.*, 618 F.

Supp. 2d 1271 (D. Colo. 2009) regarding the Aurora, Colorado Pit Bull ban ordinance.

Although I may take judicial notice of another court's order for the limited purpose of

recognizing the "judicial act" that a ruling represents, *see Najjar v. Ashcroft*, 257 F.3d

1262, 1283 (11th Cir. 2001),"[t]he documents may only be considered to show their

contents, not to prove the truth of matters asserted therein." *Tal v. Hogan*, 453 F.3d

1244, 1264 (10th Cir. 2006) (quoting *Oxford Asset Mgmt.*, *Ltd. v. Jaharis*, 297 F.3d

1182, 1188 (11th Cir. 2002)).   Accordingly, I may not rely on the findings of facts

surrounding the Aurora ordinance to determine the rationality of the Ordinance.  *See Tal*

*v. Hogan*, *supra*.

　　　With this record, a reasonable trier of fact may find that Plaintiffs' experts are

correct and there exists no rational basis for a breed specific ordinance.  Accordingly,

summary judgment would be inappropriate.

B.　　Standing

　　　The constitutional minimum of standing contains three elements:

> First the plaintiff must have suffered an "injury in fact"—an invasion of a
> legally protected interest which is (a) concrete and particularized,. . . and (b)
> "actual or imminent, not 'conjectural' or 'hypothetical,'" . . . Second, there
> must be a causal connection between the injury and the conduct complained
> of-the injury has to be "fairly. . . trace[able] to the challenged action of the
> defendant, and not . . . th[e] result [of] the independent action of some third
> party not before the court.". . . Third, it must be "likely," as opposed to merely
> "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal citations omitted).

　　　The Tenth Circuit concluded that Ms. Dias has standing to seek retrospective relief

from injuries she has suffered from the Ordinance, stating: "Dias and Engel both suffered actual injuries because they were forced to move from Denver to avoid the reach of the Ordinance. . . .  Dias and Engel would not have left Denver but for the Ordinance." *Dias*, 567 F.3d at 1178.  The Court adds that "retrospective relief would redress these injuries." *Id.* (citing *PeTA v. Rasmussen*, 298 F.3d 1198 (10th Cir. 2002)).

Contrary to Defendants' argument, a "[plaintiff may have standing even if they have never been prosecuted or actively threatened with prosecution." *Dias*, 567 F.3d at 1178 n.8 ; *see also*, *Doe v. Bolton*, 410 U.S. 179, 188 (1973) (concluding that physicians had standing in case regarding constitutionality of abortion law even though they were not threatened with prosecution because law presented a "sufficiently direct threat of personal detriment" to them).

Although Ms. Dias's dog was never evaluated, seized or the subject of an administrative hearing by Animal Control, her standing is similar to those of the physicians in *Bolton*.  In response to the Ordinance, she changed her behavior.  She sold real property in Denver and moved outside the city and county (*Dias*, 567 F.3d at 1174).  She no longer takes her dogs to visit friends who live in Denver.  Affidavit of Ms. Dias (ECF No.100-14 at ¶ 7).  She indicates that she does not use the Denver parks because of the Ordinance. *See id.*  She is cautious about driving into the city with her dogs in the vehicle for fear that they may be seized.  *Id.* at 7 [sic].  Thus, the Ordinance presents a sufficiently direct threat of personal detriment to Ms. Dias to give her standing.  Like the *Bolton* physicians, she "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief."  *Id.* at 188.  Due to her ownership of two dogs that either are or display characteristics of Pit Bulls, Ms. Dias has a personal stake and interest in a case challenging

14

the Ordinance.  *See Poe v. Menghini*, 339 F. Supp 986, 990–91 (D.C. Kan. 1972) ("A justiciable controversy exists where plaintiffs with a personal stake and interest are arrayed against persons with adverse legal interests in a sufficiently immediate adversary context to warrant declaratory relief.")).

C.    Government Officials

Defendants seek dismissal of the named human beings, claiming that Plaintiffs have "failed to allege any basis for pursuing claims of a substantive due process violation against the individual defendants in their individual capacities."  Mot. for Summ. J., ECF No. 94 at 14.  Plaintiffs did not respond to Defendants' argument.  An argument to which no response is offered may be deemed confessed.  *See Alvariza v. Home Depot*, 2007 WL 794187 *8 (D. Colo. 2007).  Accordingly, I shall deem the argument to be confessed and shall dismiss Hickenlooper, Severson, Kelly and Zalasar in their individual capacities.

Even had Plaintiffs responded, I would rule in Defendants' favor.  Personal participation on the part of the defendants is a prerequisite to an action under § 1983.  *See Bennett v. Passic*, 545 F.2d 1260 (10th Cir. 1976).  A claim within Section 1983, ". . . must be set forth with specificity; mere argumentative and conclusory allegations will not suffice." *Campbell v. Anderson*, 335 F. Supp. 483 (D. Del. 1971) (quoting *Gittlemacker v. Prasse*, 428 F. 2d 1, 6 (3d Cir. 1970) (internal quotations omitted)); *see also, Jones v. Cmty. Redev. Agency of City of Los Angeles*, 733 F.2d 646, 649–50 (9th Cir. 1984). Plaintiffs have not described any actions of the individual Defendants with sufficient specificity to show that they were personally involved in depriving Plaintiffs of any right, privilege or immunity secured by the Constitution and the laws of the United States.  The Amended Complaint merely identifies the city employees in Paragraphs 13 through 16

15

(ECF No. 54).  In Paragraph 40, the Plaintiffs state only that Ms. White's hearing was rescheduled after she spoke with Zalasar at Animal Control.  *Id.*  This does not demonstrate conduct giving issue to liability.  In sum, these statements do not show how the individuals were personally involved in violation of Plaintiffs' constitutional rights.

Finally, claims against government employees in their official capacities are considered to be claims against the entity that employs them.  *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1009 (10th Cir. 1998) (citing *Kentucky v. Graham*, 473 U.S. 159, 165–66 ((1085)).  Accordingly, Hickenlooper, Severson, Kelly, and Zalasar should be dismissed as defendants in their official capacities because their liability is co-extensive with that of the City and County of Denver's.

Accordingly, it is ordered:

1.     Defendant's motion for summary judgment (ECF No. 94) is granted in part and denied in part.

2.     Plaintiffs' claims for retrospective relief from a violation of their substantive due process remains pending.

3.     The individually named government officials are dismissed in their individual and official capacities.

4.     Said officials may have their costs pursuant to Fed. R. Civ. P. 54(d).

DATED at Denver, Colorado, on September 29, 2010

BY THE COURT:

_____
Walker D. Miller
United States Senior District Judge